May it please the court, Julian Poon on behalf of Appellant Southern California Edison Company and Southern California Gas Company, I'd like to reserve five minutes for rebuttal. This court should reverse with instructions to enter summary judgment for SoCal Edison and SoCal Gas because the Orange County Transportation Authority, OCTA, by physically invading our Santa Ana and forcing the relocation of those facilities to clear a space for OCTA's streetcar has triggered the government's obligation to pay just compensation under the Takings Clause as well as under Section 40162 of California's Public Utilities Code. And counsel, as I understand, the district court sort of reasoned, tried to make the But that distinction is based upon case law that's been in existence for over 100 years, some of which would indicate that the actions would be more governmental versus proprietor. If we decide the issue, we would be essentially creating what California law is here. Why shouldn't we certify, or is it your position that we should certify the question to the California Supreme Court? First of all, Your Honor, this court would not be creating California law in this regard. California law has been settled for well over a century. It's undisputed that the relevant time the federal law prescribes the temporal baseline is 1938, when we acquired our franchises, transportation was universally classed as proprietary, quote-unquote. This is from the Coleman case. It's also reflected in a slew of California Supreme Court and Court of Appeal decisions that we've cited, including The other side would say, look, there's a recent case, a 2020 case, that said that we should really do away with this structure. This case from the California Court of Appeal cannot be reconciled with the United States Supreme Court's decision on Los Angeles gas and electric, which is controlling, number one, it completely misread the controlling facts of L.A. gas and electric. Number two, it cannot be reconciled with California Supreme Court precedent. As the dissent in that case pointed out, it wasn't even following California Supreme Court precedent, namely the Southern California Gas Company case in 1938. Let's assume that they're not just relying on that, but they're relying on a whole slew of cases, not just from this state, but from others. And and it's it isn't it a question, though, of the interpretation of state law that that that will guide the decision? A reasonable question as to that, your honor. Until 2020, no case that ever suggested that transit rail or municipal rail could be classed as as proprietary. Sorry, as governmental in California. It's always been classified as proprietary. That was the square folding of the California Court of Appeal in the postal telegraph cable case, which said that Los Angeles gas and electric can't be distinguished from it. That case was specifically cited with approval by the California Supreme Court in the 1958 Southern California Gas Company case. It cited that and it cited one other transit case from the Ohio Supreme Court and said it's it's proprietary. And that's how it's and Los Angeles gas and electric and Los Angeles gas and electric is controlling. I would say on the certification question, there's no need for that here. Neither party has asked for that. It would be completely inappropriate here. There's no question as to what California law has. We have it from both the United States and the California Supreme Court. Keep in mind that Los Angeles gas and electric, it arose from the city of Los Angeles. It was, you know, the background or the backdrop was California law property rights, which had always and until 2020 classified transit as you as a council. But you can see that there that there is a contrary case law in the lower courts in California on this point. Correct. There is only one split decision from the California Court of Appeal. But the problem is that these cases don't come up every five years. They come up every hundred years. I mean, they come up every, you know, you know, 20, 30 years. But it wasn't the state court of appeals is place to effectively overrule California Supreme Court. But you're not answering my question. My question is that isn't it the case that we have a contrary case law in the lower courts on this very important issue? And shouldn't it be then the play? I have one. Let me finish my court of counsel. Let me finish my question. I apologize. And shouldn't then we allow California courts to, in fact, decide the issue that there is no need for this court to outsource its work on state law to the California? Again, no, no, no party has asked for that here. And that would be inappropriate. There's no need for a California law has been clear, crystal clear. And the Riverside case, it completely misread L.A. Gas and Electric. It thought that case was a case of complete displacement. And it wasn't. We can demonstrate that on the facts of the record. As we explained in our brief, the Supreme Court, the U.S. Supreme Court said in that case there was no absolute displacement and that it didn't matter as long as there was a partial displacement. And that case is on all fours. There's no need to certify because this court is bound by the United States Supreme Court's decision in Los Angeles. Gas and Electric there. As here, we had franchise rights to be in the public streets. Those are property rights that have always been protected by California law. And we cannot be forced to move from those locations without the payment of just compensation. So in the city of Los Angeles, I think the court uses the word proprietary twice in its opinion. Once describing the argument made by the gas company. Once describing what the court below had held. Why shouldn't we? I mean, so you want us to read that case as sort of establishing this whole thing turns on whether it's governmental or proprietary. Why isn't another possible reading of the opinion that they just thought it was completely arbitrary for the city to be taking a private electric company or gas company and making them move so that they could set up a competing company doing exactly the same thing as the people they were making move. And the court actually said there is no public necessity for the city to engage in this business. That's also being engaged in by the corporation. Why isn't that, rather than the sort of rigid governmental proprietary distinction, the holding of that case? For at least three reasons, Your Honor. Number one, I believe the passage Your Honor was referencing is at 251 U.S. page 39, where at the end of the carryover paragraph, the court specifically endorses that distinction, which has always been. California law was universally applied. It was applied by the U.S. Supreme Court and L.A. Gas and Electric and Russell versus Sebastian, another U.S. Supreme Court case that L.A. Gas and Electric relied on. And number two, to change all that now and revise what California law is, Riverside effected a judicial taking in violation of Stop the Beach, which this court endorsed in Vandevere, Ballinger, and Wells Fargo. And it's not this kind of rigid on the competitor rationale. That is not, with respect to a plausible reading, I think, of the ratio dissidentity of Los Angeles Gas and Electric. The takings clause is not some reverse Sherman Act of some sort. No case has ever suggested that whether the government is trying to compete, whether the government is taking a private UPS store to open a post office versus a VA hospital, that doesn't matter. As long as the government is physically invading that property to take it for whatever reason it wants, that constitutes a per se physical takings under the Cedar Point decision from just two years ago. So it's physical, but it's a physical taking of a franchise you've been granted on public rights of way. And the court in Norfolk Redevelopment stated the common law rule as when you've been granted a franchise, you can be made to move. It didn't refer to the governmental proprietary distinction in its articulation of that rule. Well, with respect, Your Honor, it's specifically cited in the Quillen Treatise, which explicitly cited the governmental proprietary distinction. So I think in that 1983 decision by Justice Rehnquist, it was a shorthand reference to that. I would also say that Norfolk Redevelopment is completely distinguishable, because if you look at the end of the court's opinion, the court specifically says both on the facts of Virginia law and on the both on the Virginia law and the facts of what the established practice had been between that utility and Virginia or the county there for decades had been the utility had to pay to move whenever. That's very different than the case that we have here, where for well over a century, public transit and transit rail had been universally classified as proprietary. And if this court has some concerns about whether perhaps it's rigid or it's outdated or whatever, the court can't just rewrite property rights. That was part of the bundle of sticks that we acquired in 1938, that the right to be in those to use the public streets for our facilities, which we maintain a considerable expense and paid millions in annual franchise fees for and not to be displaced from those locations, except for what was had always been classified as a valid governmental rather than proprietary function. For this court to recharacterize that bundle of sticks and take some of them out now, that would constitute a takings for which just compensation has to be paid. So if they were putting in a sewer project, you could be made to move without compensation? Correct. That was always the understanding. And same thing for a road. They decide they want to widen the road. It's just going to be a regular road, not a railroad. Widening of the road is different. That's controlled by a separate statute, section 6297, I believe, of the Civil Code. But there's no question, there's no request here from the municipality. There's no question of the widening or the change in the grade or the alignment or the width of that. That was at specifically page 41 of the reporter's transcript. Okta's counsel specifically admitted to the district court and conceded that that wasn't what was going on here. Those franchise and statutory provisions were not in play because there has been no request from the municipality to move here in order to change the width, alignment, or grade of the public street here. So maybe your answer is just because the cases say this is the way it's always been. But what is the logic behind saying that sewers and roads are fine, but rail systems, which seem to serve a similar function, they allow people to move around through the city, are not okay? It's a legal classification that, as your Honor pointed out, has evolved over more than a century. It's the common law process, common law adjudication. That was the backdrop against which we acquired our rights. But if I had to hazard a guess for the theoretical underpinnings of that, I would point again to the language of Los Angeles Gas and Electric, which is squarely controlling here, which talked about whether there is a, quote, real public necessity arising from consideration of public health, peace, or safety, whether the public peace, health, or safety is imperiled. There's no question of anything like that. There's no evidence anywhere in the record to suggest that life or limb or anyone is being hazarded or jeopardized or harmed in any way by the facilities that we've long carefully maintained for decades. But nobody's life was endangered by, like in Cincinnati, Indianapolis, and Western. They just wanted to put a road across the railroad. Nobody's life was endangered by not having a road there, but that was a governmental function. Well, with respect, if your Honor is referring to the first Chicago Burlington and Quincy Railroad case from 1897, I believe the court did say that. I forget the colorful language it used, but it was the onset of a Burling locomotive or whatever. It could endanger the citizenry of that town. And so, therefore, there had to be certain crossings for farmers and their families or whatnot to cross what was then a Burling locomotive. So that was a case where public health or safety was pointed out. In the Panhandle case from the U.S. Supreme Court, they talked about serious danger, quote, unquote, to life or limb. The California Supreme Court in Rose v. Stake talked about a, quote, unquote, emergency justification. For the kind of easement here, keep in mind, we have what the California Supreme Court has held for over a century, without contradiction, is, quote, real estate in the nature of an easement. These are real property rights that are being physically invaded and taken from us, perhaps for a laudatory purpose, but there are a lot of things that the government does that are laudatory that the government has to pay just compensation for and can't simply foist the burdens on a private property holder who's paid considerable sums for the right that we have here. And so, again, to change all this, these are the longstanding background restrictions on property rights. The temporal framework is set by Lucas, by a long line of U.S. Supreme Court President Phillips, a bunch of cases we've cited. Cedar Point, most recently, and they say, look at the inquiry undertaken in those cases. We look back to the point in time prior to which you acquired the property rights. Cedar Point was looking at California real property law prior to the promulgation of the challenge regulation in that case. Lucas, obviously, was looking at historical South Carolina beach law and property law prior to the enactment of the regulation challenge there. Stop the Beach, similarly, for Florida, avulsion law and beach coastal law there as well. And here, it's uncontradicted. They haven't disputed. That's always been the law in California until at least 2020 on a case that's seriously flawed and misreads binding U.S. Supreme Court precedent. It conflicts with California Supreme Court precedent. This court is bound under its en banc decision in Paulson and as well as its prior circuit precedent in Assaviz versus the Assaviz versus Allstate 68 F3rd 1160 to follow even dicta from the California Supreme Court. And that's up. The California Supreme Court has never questioned the governmental proprietary classification. So this is very much unlike, for example, they said it Oregon Supreme Court case, Northwest natural gas. In that case, the Oregon Supreme Court said we are going to do away with the governmental proprietary distinction. So going forward, fine. That would be the background understanding. Those would be the bundle of rights the property holder acquired against. But it's very different where here nobody's ever questioned that until the riverside. It can't really. Whatever the government does is governmental. What if the government decides to open a for-profit Botox clinic or a subway franchise at a terminal? That's all. They can just take over the private property, invade it, and set up their own for-profit delivery store or what have you. That can't be the law, but that's the logical consequence of what they're urging here. I do want to also reserve. I want it to reserve. We'll give you some time for rebuttal. Could you say just a bit about the state law claim before you sit down? Absolutely.  Yes. It seems like your friends on the other side are perhaps asking us to ignore the first sentence of that, but you seem to be asking us to ignore the second sentence. Not at all, Your Honor. We are asking the court to read both sentences of 130241 in harmony and consistent with each other, rendering neither surplusage. And under the Supreme Court's recent decision, I believe by Justice Kagan writing for the court in the Ransom versus FIA Card Services, we're asking for a plain meaning reading of applicable. That court there cited a boatload of dictionaries and said it means capable of being applied. And in that case, I think they looked at literally was it capable of being applied. The debtor there owned his car free and clear. So he literally could not avail himself of the car ownership deduction in those cases, which was only available if someone made monthly car loan and lease payments, which he obviously didn't. He owned his car free and clear. And so here, the example we give is there's a sue and be sued provision in the District Act. And obviously, OCTA, the authority, cannot sue and be sued in the name of the district. That would make no sense. And so that's an example. But it's not a free-ranging grant of discretion. This is unprecedented to the agency to pick and choose whatever laws it wants to be bound by at any given point in time. That's remarkable. I don't think there's any precedent for that. It might be, but Counsel, isn't that the language? I'm sorry? It might be remarkable, but isn't that the language? Well, Your Honor, that is not the language under the Supreme Court's ransom decision, I would submit. That is the way to make both provisions of both sentences, 130241, give it meaning. Because the first sentence, as I believe Your Honor seemed to recognize, it says, shall be equally applicable. But under their reading, that means nothing. They blue-penciled it all out. They've rewritten 130241 just to say the authority shall determine which provisions of the District Act it wants to have applicable to it whenever it wants. That's how it's rewritten the statute. And so what – just take me through again. What does it mean to say that the authority shall determine which provisions are applicable? What do you think the authority gets to determine? The authority shall determine whether it's literally possible in the ransom sense. Do you literally qualify? Like, could it be possible for these provisions to apply to it? And keep in mind here that the authority specifically cited Section 40180 of the District Act in its application to the State Public Utilities Commission for permission to construct six ag-grade crossings needed for the O.C. streetcar. It's invoking – it has to take the bitter with the sweet. It's invoking a particular provision of the District Act concerning acquisition of rights-of-way needed for its streetcar. And so with it, it has to take a sister provision right in the same part, right in the same chapter, right in the same division, talking about what one has to do, what the authority has to do, in order to pay for the acquisition of the rights-of-way. And that's specifically Section 40162 of the District Act, which applies here. Okay. Thank you, Counsel. I reserve the balance of my time. Yeah, we'll give you three minutes. Thank you, Your Honors. Mr. DeBerry? Good morning, Your Honors. David DeBerry. I'm representing – we refer to it as O.C.T.A. and not OCTA. So when referring to the Orange County Transportation Authority, I'll be referring to O.C.T.A. So Your Honor brought up a point that I had intended on presenting to this Court. So the reason L.A. gas does not apply is twofold. In the first place, as Your Honor just mentioned earlier, what the Court found was that there was no public need or necessity for another electric streetlighting system. There were already several electric streetlighting systems in place, and the Supreme Court specifically referenced the District Court's finding that there was no real public necessity for the streetlighting system arising from any consideration of public health, peace, or safety. There was no real reason for public necessity or any reason for the City to engage in the streetlighting business, because not only was their existing streetlighting system existing, there was no evidence that it was not doing it in a perfectly fine way. Counsel, what do we do? What do we do with postal telegraph? Postal telegraph was based upon an interpretation of L.A. gas that no other court in California has followed. Their interpretation is that L.A. gas called a particular system proprietary, and for that reason the governmental agency had to pay. The Supreme Court specifically noted that that argument actually was made by Southern California Gas before the Supreme Court in 1958. Well, hold on. But wasn't the 1950—I just want to get it right here. I believe it was the 1958 SoCal case, right? Yes. That cited, in fact, postal telegraph. In a spring citation, yes. Well, it could have easily overruled. It could have easily addressed its deficiencies. It could have done a whole host of things, but the California Supreme Court decided not to and instead cited it there. Yes, it did, but it also distinguished Los Angeles Gas. What it said was, and this is a point OCTA has been making about the difference between L.A. gas and the case here, is it says the city in the Los Angeles case sought to establish a lighting system of its own. It was noted that the only question was whether a city may, as a matter of public right and without compensation, clear a space for the instrumentalities of its system by removing or relocating the instrumentalities of another system. So it distinguished L.A. gas for the very same reason that OCTA did and also for the very same reason that the appellate court did in 1966 in the case of... That was the Northeast Flight Control District case and then also the RTC case in 2020 and then also the court case in, I think it was, 1997, the Pacific Telephone and Telegraph Company case versus the Redevelopment Agency. So we got three appellate court decisions and the California Supreme Court all distinguishing L.A. gas on that same basis. And not only that, the Oregon Supreme Court distinguished it on that basis as well. I think the utilities represented that RCTC case was the only case that distinguished L.A. gas on that basis, but, no, in fact, four times California courts have distinguished it on that basis. But what are we... You heard the passage that counsel read on page 39, and they followed by a string cite to a bunch of cases that it does seem like the court thinks that there is some significance to the distinction between traditionally governmental activities and traditionally proprietary activities. So why don't we have to treat that as part of the holding of the City of Los Angeles? Well, I think you have to look at the reason they were treated differently in the L.A. gas case. And, in particular, in that particular case, they found that they were engaged in a proprietary activity not because of the nature of the electric system. It was because there was already electric systems in place and they were taking over a portion of a private utility's business. So in the sense of proprietary, it was not the nature of the business. It was what the city was actually doing. It was coming in, competing with existing utilities that they had already given a franchise to, and they weren't providing any... There was no public health, welfare, or benefit to the city providing electricity, which has always been the test as to whether a proper governmental use of the street is being done. And that test comes from the Drainage Commission of New Orleans case. That case said that when the government is putting in a project that furthers the public peace and health, public peace, health, safety, or welfare, then the utilities have to relocate at their cost. And in your view, that's basically anything that the government decides to do, other than, I guess, directly compete with the entity that they're requiring to relocate. Is that right? What I think the rule is in California is that... The Supreme Court said this in Indian Towing too, that any activity that the government engages is governmental and that it's uniquely governmental. But just take a second. Just take a second and listen to what you just have said. Imagine if that's the rule and what the effects that that kind of a decision and conclusion is being made here. So you're taking the position that Riverside decided in 2020, Riverside County Transportation, is accurate, and that's the way we should be treating this, that anything that the government does is governmental. I don't think the RCTC court, the Riverside County Transportation court, didn't go that far. Whatever local government is authorized to do constitutes a function of the government. Which is accurate. But does it necessarily follow that the government activity that's being undertaken requires, under the common law, the utilities to relocate at their cost? And as was said in the redevelopment case, there are two differences. One is if the legislature has specifically provided by statute to shift the cost obligation from the governmental agency to the governmental agency, as it has in a couple of statutes that apply to metropolitan, then the cost liability lies with the government. The second one is whether or not there's a taking. So if you have facts similar to LA Gas where there's a taking, yes, the government has to pay. And I would say that it wouldn't matter in that particular case whether they were substituting out an electrical system, a water system, or even a sewer system, which has been always held to be governmental. If there was, in fact, a private utility providing sewer service there at the time and doing so adequately, and they came in and they caused them to move out of there so that they could provide their own sewer system, LA Gas would have been decided exactly the same way. However, if there had not been an electrical lighting system in place, that's the key factor. If there had not been an electrical lighting system in place, based upon the court's decision, they would have noted that that was for the public health, welfare, and benefit. And LA Gas would have been decided differently. So, for instance... So, I mean, you think it really is just an anti-competition principle? It's that and whether it's not just competing. So I don't think that's enough. It's really are you taking over a portion of the business? It wasn't a competition. It was a monopoly, right? So previously there was one monopoly, and now the city was saying, not only can you no longer compete, we're going to be the sole provider of this service. So you guys are out, and we're going to take part of your business. I would say that in our case, if this was a utility that was up here that was providing a public streetcar that, by all accounts, was operating efficiently, and we came in and we were displacing that streetcar, LA Gas would apply. That would be a taking. But the discussion of proprietary in the opinion is kind of odd if that's what they're getting at, isn't it? Because there was, I gather, in the early 20th century, and I take the point that Indian Towing, among other cases, points out that maybe this distinction doesn't really make a whole lot of sense, but it does seem to have been a distinction that existed in the law in the early 20th century. And that's a concept and a distinction that the court referred to in the city of Los Angeles. So why don't we read the opinion as bringing in all of those concepts that existed at the time? Well, I'm not discarding LA Gas. I hope that's pretty clear. I think in that context where you have a municipality, a city, a public agency that's moving in and putting in a system, whether it's electric, sewer, water, even a streetcar that already exists and is being provided by a private utility. But where is that? They are now acting as...  I mean, I understand that analysis. And I guess I'm trying to find that somewhere in the case law that you're... I mean, I understand that that's what you're saying and that's what you want us to consider those, but where is that in terms of a statement of law that's been issued by any California court? Well, it's for one... Oh, okay. Initially, it's in the Supreme Court decision itself. Here's what the Supreme Court said. What was at issue was a proposed uncompensated taking or disturbance of what belongs to one lighting system in order to make way for another. And this, the 14th Amendment, forbids. So that case was always about an unconstitutional taking. It was really not based so much on the proprietary governmental distinction. It was more based upon this was a taking of a business by a governmental agency. No, no, no. I mean, but the fact that it's a taking, I mean, that's the conclusion that they drew. Right. Right. I mean, so I don't think you can invoke that. That it is a taking is the end of the analysis, right? And the analysis begins with, I mean, I guess you'd dispute that. Either they're competing with setting up a business to do the same thing as what's already being done by the private franchisee, or they're displacing the private franchisee for a proprietary rather than a traditionally governmental function. But it seems circular to invoke the taking language because that's the end of the analysis. Well, you're right. That is the end of the analysis. But the beginning of the analysis also, so where they hold that it's proprietary, and I know you have read the case, but the case holds that it's a proprietary function because there's already existing utilities there. Okay, so that, but I mean, why, I mean, the other side's position, and there is some support in the early 20th century case law for this, is that what they're saying is that it's proprietary because rail systems are inherently proprietary in a way that, you know, sewers and roads are on the governmental side, and, you know, rails and lights and gas works, I guess, are on the proprietary side. Like, why isn't that the distinction that's being applied? So in the utility relocation context, the only case you have for that proposition is postal telegraph. And in our view, in OCTA's view, it's based upon a false reading of LA Gas. But again, it hasn't been overruled. Well, it has several times. In fact, it was, well, it's been disputed, let me put it that way. It's been disputed by, it was obviously disputed in the Riverside County transportation case. And I will note, as you are aware, that these utilities petitioned the Supreme Court to review that case or at least depublish it. And while that certainly doesn't cement the question of whether the Supreme Court would agree with it or not. Well, let's stop there, which is the first question I ask the Council, which is if there is this dispute between Riverside and postal telegraph, why don't we certify the question to the California Supreme Court to give us an answer? If this distinction is a distinction that we're no longer going to operate under, that's fine. Should we be making that decision or directing that to the Supreme Court? Well, OCTA has no opposition to that. And if it would have been our preference, we would have, this case would have been in state court right away so that this court would not have to be in a position of speculating what the Supreme Court might decide, but the Supreme Court could actually decide. Why is it up to the California Supreme Court to decide? I mean, isn't the question what the rights were when they were granted the franchise in 1938? I mean, so the California Supreme Court could decide something totally different today, but I'm not sure that would answer the federal constitutional question. Well, the federal constitutional question is whether there's a taking or not. Right, but isn't that determined by reference to the rights that they had? So the rights that they had were to put their pipes in the street to operate their franchise, but they are subject to, in the law at the time when they accepted their franchises in 1937, as stated by the United States Supreme Court in the Drainage Commission case, is those rights were subject to reasonable police regulations that furthered the public health, safety, and welfare. Right, I get that that's, I mean. But that was the law. That's your position, and that may be right, but my point is simply that you're either right or not about that. Either you're right or you're not when you say that that was the law in 1938, but what the California Supreme Court might say today or tomorrow can't change whether you're right or wrong about that because it's a sort of question of what the historical rights were, isn't it? Right, but that's my point. So the utilities say, well, our rights were established when we accepted our franchises in 1937, right? So those rights were based upon whatever the law was at the time. And the law at the time was postal telegraph. Was what? Postal telegraph. Based upon a reading of L.A. Gas, which was not consistent with the readings of L.A. Gas since that time. So let me just, on the notion that when they took their franchises, that they never thought they would have to relocate because of a rail project, their franchises specifically require them to relocate for viaducts and subways. A viaduct, by definition, is an elevated rail. Subway is an underground rail. Is that right? An elevated structure, but you can't have a road viaduct? Well, a viaduct can be an elevated roadway, it can be an elevated rail, it can be an elevated water. Okay, but I think their position is that roads and railroads are different from each other, right? Because one is traditionally governmental. I was just trying to address the point that they made. Well, we never thought that we would ever have to relocate at our cost for a rail project. Their franchises specifically call that out. Before you run out of time, can you say something about the state law question? Yes, so they cite to the Supreme Court's decision of ransom for the proposition that applicable means it must be applied. But in that case, the Supreme Court specifically said they defined applicable as capable of being applied. OCTA doesn't dispute that. OCTA is capable of being applied, but it doesn't mean that it must apply it. I think Your Honor is correct. The reading out, if all the provisions just simply apply, where is the usefulness or the meaning of the language? It doesn't just say it requires OCTA to determine which provisions apply. And there's good reason for it because there are competing provisions in the Transit District Act and in the legislation creating the Transportation Authority. The Transportation Authority has, for instance, its own power of eminent domain. But then what's the point of the first sentence? The point of the first sentence, so it makes it applicable to OCTA, and there is a reverse statute which makes OCTA's provisions applicable to the Transit District. So it gives them the authority to exercise each other's powers. But it allows both the Transit District to determine which provisions of OCTA's powers it's going to perform, and it allows OCTA to determine which provisions of the Transit District it shall perform. Then on top of that, the statute is also clear that that particular section, which requires the Transit District to pay for relocations, only applies when it's exercising the power of eminent domain. And it's a compensation statute. It doesn't change when the common law or when the Constitution requires payment. It sets out what that compensation shall be. I have a minute and five left. One of the things I did want to point out is that, as far as the governmental proprietary distinction is concerned, so the citation by the Supreme Court to Postal Telegraph was in 1958. And again, it was just a string citation. But as Your Honors pointed out, there might have been an assumption by the Supreme Court that this proprietary distinction still existed. But it didn't really directly address whether or not the governmental proprietary distinction existed in that particular case. But just three years after that case, in 1961, the California Supreme Court did directly address the proprietary government distinction in the field of torts, from which the distinction sprang. And in Muskoff, the court found the distinction to be without any rational basis, and none of the reasons for its continuance could withstand analysis. And then, based upon that, you have three appellate court decisions following Muskoff, which look to that particular decision in finding the governmental proprietary distinction unworkable in the utility relocation context. Thank you. Thank you, counsel. Thank you, Your Honors. I'd like to make three points in rebuttal. Number one, I think this all comes down to the United States Supreme Court's controlling decision in Los Angeles Gas and Electric, which has never been overruled and undersettled. The Supreme Court precedent, including the Dalton v. Vector case cited, has to be applied. And also Rodriguez v. Quijas. No matter what doubts or reservations you might have about the currency of the reasoning or how up-to-date it is or whatever, it's controlling, and it has to be applied. And all you've heard are a number of completely implausible attempted distinctions, either by the Riverside Court in 2020 or by Octa's counsel, which bear no resemblance to the facts or the law of Los Angeles Gas and Electric. They talk much about they struggle with this competitor rationale or sometimes taking over part or whole the business. I would commend to Your Honor's attention to ER 127, where the city, in its briefs to the Supreme Court in, I believe, 1917 and 1918, was crystal clear that it had no intent to take over the whole business or anything like it. And Octa's counsel is trying to recharacterize it as a taking of a business? That wasn't the property interest. That's a creative reinterpretation of Los Angeles Gas and Electric. But what was taken were the franchise rights. L.A. Gas and Electric specifically cited Russell v. Sebastian from a few years ago, also from the Supreme Court, also coming out of California and looking at those California property rights and saying it's a franchise right. It's a franchise right, which is real estate in the nature of an easement. And that is what is being taken. In point of fact, in L.A. Gas and Electric, it was just six locations along one street, York Boulevard, in Los Angeles. There wasn't any kind of wholesale or major takeover of the business of providing street lighting. Again, at ER 127, there's talk of a number of different providers, private and public, of street lighting services in California. And on the law, I think we had talked about page 39 and page 40 of 251 U.S. With respect, I don't believe that the high court's decision can be read as or reinterpreted as just, oh, it's arbitrary or whatever. I don't think there's any discussion of that. I think it's grounded in the governmental proprietary distinction, which, as Your Honor recognized, that's always been the law. After repeated questioning, Octa's counsel couldn't cite you any utility relocation cases within a half-century or more radius of 1938 when we acquired our franchise rights, holding that any form of transportation, let alone transit rail, was governmental. It simply wasn't. That was just a complete rewriting of the law of long-settled California law in 2020 by the Riverside Court. And that is not—it's ultimately, as Your Honor recognized, it's ultimately a federal law issue, what property rights we had and what were abridged in 1938. So asking the California Supreme Court now in 2023, what do you think of the governmental proprietary distinction going forward, that might have some interesting academic value or satisfy someone's curiosity. If it doesn't answer the federal law question for this court, which is controlled by directly on point U.S. Supreme Court precedent, L.A. Gas and Electric is on all fours with this case and cannot be distinguished either factually or legally. So it's controlling and requires reversal. Thank you, counsel. Thank you, Your Honor. We thank both counsel for their helpful arguments. The case is submitted and we are adjourned. All rise. Court for this session stands adjourned.
judges: MILLER, MENDOZA, Moskowitz